**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**ROSA L. VIGIL,**

      **Plaintiff,**

vs.                                                                                                                **Civ. No. 00-230 LH/RAP**

**KENNETH S. APFEL,
Commissioner of Social Security,**

      **Defendant.**

**UNITED STATES MAGISTRATE JUDGE'S
ANALYSIS AND RECOMMENDED DISPOSITION[1]**

1.      Plaintiff, Rosa L. Vigil, (Plaintiff herein), filed applications for Disability Income Benefits (DIB) under Title II of the Social Security Act, and for Supplemental Security Income Benefits (SSI) under Title XVI of the Social Security Act on April 18, 1997 (Tr. 37, 279), alleging a date of disability of May 15, 1993. Her applications were denied at the first and second levels of administrative review. On April 20, 1998, an Administrative Law Judge (ALJ) found that she was not disabled. (Tr. 12-20). Plaintiff appealed the denial of benefits to the Appeals Council, submitting additional records pertaining to her mental condition. The Appeals Council declined to review the ALJ's decision on September 16, 1999. (Tr. 6-7). Plaintiff was subsequently found disabled and entitled to benefits pursuant to an application for SSI filed on January 21, 2000. (Exhibit "A" to Plaintiff's Memorandum in Support of Motion to Reverse or Remand, Docket No. 10). The matter now before this Court is Plaintiff's Motion to Reverse the decision of the

---

[1]Within ten (10) days after a party is served with a copy of these proposed findings and recommendations, that party may, pursuant to 28 U.S.C. §636(b)(1), file written objections to such proposed findings and recommendations. A party must file any objections within the ten (10) day period if that party seeks appellate review of the proposed findings and recommendations. If no objections are filed, no appellate review will be allowed.

Commissioner with regard to the denial of DIB benefits and the initial denial of SSI benefits.

**I.     Standard of Review**

2.     This Court reviews the Commissioner's decision to determine whether the records contain substantial evidence to support the findings, and to determine whether the correct legal standards were applied. **Castellano v. Secretary of Health & Human Services**, 26 F.3d 1027, 1028 (10th Cir.1994).   Substantial evidence is " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " **Soliz v. Chater**, 82 F.3d 373, 375 (10th Cir.1996) (quoting **Richardson v. Perales**, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)).   In reviewing the Commissioner's decision, I cannot weigh the evidence or substitute my discretion for that of the Commissioner, but I have the duty to carefully consider the entire record and make my determination on the record as a whole. **Dollar v. Bowen**, 821 F.2d 530, 532 (10th Cir.1987).

3.     The Commissioner has established a five-step sequential evaluation process to determine if a claimant is disabled. **Reyes v. Bowen**, 845 F.2d 242, 243 (10th Cir.1988).   If a claimant is determined to be disabled or not disabled at any step, the evaluation process ends there. **Sorenson v. Bowen**, 888 F.2d 706, 710 (10th Cir.1989).   The burden of proof is on the claimant at steps one through four;  the Commissioner bears the burden of proof at step five. **Id.**

**II.    Issues on Appeal**

4.     Plaintiff contends that the Commissioner's decision denying her DIB and SSI benefits should be reversed due to the following errors:

   A.    The ALJ's finding that Plaintiff's mental impairment of depression was not "severe," was not supported by substantial evidence and was not based on correct legal standards;

> B. The ALJ failed to fully and fairly develop the record;
>
> C. The ALJ's finding that Plaintiff had the residual functional capacity for the full range of light work was not supported by substantial evidence and was not based on correct legal standards;
>
> D. The ALJ's rejection of Plaintiff's credibility was not supported by substantial evidence and was not based on correct legal standards;
>
> E. The ALJ erred in his evaluation of Plaintiff's obesity, and
>
> G. The ALJ improperly disregarded the records of a treating physician.

**III.   Vocational and Medical Facts as of the Date of the ALJ's Decision.**

5.   Plaintiff was born on October 14, 1960. (Tr. 37). She is a high school graduate, and has past relevant work as a maid, nurses' aid and laborer. (Tr. 74, 78). Because her insured status for DIB benefits expired on September 30, 1996 (Tr. 40), she had to establish a disability existing as of that date in order to qualify for DIB. **Miller v. Chater**, 99 F.3d 972, 975 (10th Cir. 1996); **Potter v. Secretary of Health & Human Services**, 905 F.2d 1346, 1347 (10th Cir. 1990).

>   **A.   Medical Evidence Presented to the ALJ.**

6.   Plaintiff was working as a nurses' aide on May 10, 1993, when she injured her back. On initial examination she had pain, muscle spasm of the lumbar spine and positive straight leg testing. Her treating doctor, Byrch E. Williams, M.D., diagnosed a herniated disc at L5-S1. She was treated with pain medication and sent home. (Tr. 119, 263). Three days later she was placed on "off work" status and referred to physical therapy. (Tr. 119). An x-ray obtained on May 29 revealed L-5 disc space narrowing. (Tr. 118).

7.   By June 3, Plaintiff had a clinically "stiff" back, pain complaints, but no signs of any

neurological problem. (Tr. 119). Dr Williams advised that she could return to work on June 13, 1993.

8.      Plaintiff continued to attend physical therapy from June 8 through June 14, 1993. ( Tr. 111-113). On June 14, 1993, her physical therapist stated that she could return to light duty work with these limitations: (1) no lifting over 15 pounds, (2) no repetitive lifting, (3) no bed making, (4) no transferring or walking of patients, (5) no pulling carts, wheelchairs, beds, etc., and (6) no guarding patients from falling. (Tr. 111). Dr. Williams examined her on the same date, found her physical examination to be normal, and released her to work for four hours per day, with no lifting over 15 pounds. (Tr. 116.)

9.       Plaintiff returned to work on or about June 17, 1993, but left after three hours, complaining of severe pain. (Tr.116).  Dr. Williams examined her on June 21, and noted an equivocal straight leg raise test and absent left ankle jerk. He made no diagnoses, but again placed her on "off work" status and scheduled an MRI evaluation of her back (Tr. 116). The MRI showed disc space narrowing at L5-S1 with some dessication of the disc. It could not confirm any gross spinal stenosis or gross disc herniation. (Tr. 117). On August 23, 1993, Dr. Williams released Plaintiff to work "4 hrs per day on restricted schedule and work description as previously arranged." (Tr. 115).

10.     On September 3, 1993, Plaintiff developed left lower back pain with tingling and numbness in her left leg after painting at home. Evaluation at Miners' Hospital indicated equivocal straight leg raising, deep tendon reflexes of 2+, normal strength and subjectively decreased sensation. She was given pain medication for low back pain and released. (Tr. 262).

11.     The only evidence of medical care received in 1994 is an x-ray report dated November 21, 1994. Plaintiff contends that Dr. Williams continued to treat her through at least November 1994,

citing to her self-report of medical care received. (Tr. 60). This claim is substantiated, in that hospital records show that Dr. Williams was involved in Plaintiff's emergency/outpatient hospital visit of September 4, 1993 (Tr. 262), and ordered the November 1994 x-rays. (Tr. 258). Plaintiff, however, made no attempt to supplement the record with any additional records, nor is there any indication that Plaintiff ever advised the ALJ or the Appeals Council that relevant records from Dr. Williams were missing from the administrative record. The November 1994 x-rays showed no abnormality. Id.

12.     Hugh E. Naylor, M.D., became Plaintiff's treating physician in January 1995. (Tr. 199, 234-37, 243.) Dr. Naylor's records are difficult, and sometimes impossible to read. They are not, however, completely illegible. At his initial evaluation of Plaintiff on January 17, 1995, Dr. Naylor noted Plaintiff's height of 5 feet 3 inches, and weight of 223 lbs. She was complaining of chest wall pain, and had a resolving burn on her left leg. Of note, there were no complaints or findings related to Plaintiff's back [2] and Plaintiff was taking no medications. (Tr. 234). Dr. Naylor diagnosed exogenous obesity, past history of thyroid irregularity, vaginitis, and a questionable right ovarian cyst. (Tr. 237). Pelvic ultrasound performed later that month was normal. (Tr. 231.) Dr. Naylor prescribed medication for vaginitis and placed Plaintiff on a low calorie diet. (Tr. 237).

13.     Plaintiff was treated at Miners' Hospital from February 24 to March 1, 1995 for nausea, vomiting, lower abdominal pain, and severe diarrhea. (Tr. 120-146.) Discharge diagnoses included pelvic inflammatory disease (PID); urinary tract infection; gastroenteritis, resolved; exogenous obesity; history of chest wall pain; external hemorrhoids; and irregular menses associated with PID,

---

[2] Dr. Naylor's records indicate a grossly normal neurological examination and no significant findings related to her musculo-skeletal exam. (Tr. 235-236).

obesity and hormonal changes. (Tr. 120-121).

14. Esophogram and UGI Series performed on March 8, 1995, showed mild peptic inflammation and a small sliding hiatal hernia with gastro-esophageal reflux. (Tr. 228). Pulmonary Function testing on May 2, 1995, revealed borderline obstruction. (Tr. 225-226.)

15. Plaintiff was readmitted to Miner's Hospital on May 15, 1995, with six-day history of nausea, vomiting, diarrhea, cramping, lower abdominal pain and epigastric pain and a history of PID. (Tr. 147, 182). She was discharged on May 23, 1995, with a principle diagnosis of dehydration due to acute pancreatitis complicated by diarrhea and PID. (Tr. 148.) Other diagnoses were gastritis, hiatal hernia with GERD (gastro-intestinal reflux disease), reflux esophagitis, PID and hypokalemia. Id. Discharge planning included medication, weight loss, and walking. Id.

16. Plaintiff had a total hysterectomy on May 30, 1995, after numerous non-surgical attempts to control dysfunctional uterine bleeding and pelvic pain had failed. (Tr. 264-78). At discharge, her attending physician, Jameela B. Tiku, M.D., included depression as part of the discharge diagnosis. (Tr. 264). This is the first time that depression appears as a diagnosis for Plaintiff. There are no treatment notes recording clinical observations or testing to support this diagnosis, and there is no evidence of any referral for treatment.

17. Plaintiff returned to work for a one month period in 1996, as a laborer in a meat packing plant. (Tr. 78). She testified at the administrative hearing that she quit this job, which involved lifting of up to 20 lbs., because the cold aggravated her back pain. (Tr. 334 - 335).

18. Plaintiff next sought medical care on February 19, 1997, five months after her insured status for DIB benefits had expired. At that time she had an eye examination, indicating corrected visual acuity of 20/30 in both eyes, and increased risk for glaucoma due to enlarged cupping of the optic

nerves. No treatment was required. (Tr. 186).

19. After nearly two years of seeking no treatment for her back condition, Plaintiff returned to Dr. Naylor on April 3, 1997, stating that she had re-injured her back. (Tr. 219-22). Although again difficult to read, Dr. Naylor's records document positive though unspecified findings related to Plaintiff's sacro-iliac joint. (Tr. 219). X-rays performed on that date revealed no abnormalities in the pelvis or hips, but did show slight L5 disc space narrowing. (Tr. 218). Dr. Naylor diagnosed "sacro-iliac, R & L", degenerative joint disease, L5 disc, hiatal hernia and GERD, and allergic rhinitis. (Tr. 220). Plaintiff returned to Dr. Naylor on April 7, reporting that she had fallen two days earlier when her leg gave out. (Tr. 216-17). She complained of back pain. No acute abnormalities were noted on physical examination of the back and extremities. Dr. Naylor diagnosed "back pain L5 disc" and morbid obesity, noting her height of 63 inches and weight of 244 pounds. He advised her to lose weight and exercise. Dr. Naylor's treatment note of April 3 does not mention depression, nor does it list any clinical observations relative to that diagnosis. On a summary sheet listing problems and diagnoses, he wrote "depression" and "Prozac 20 mg. 1 d." (Tr. 243). He increased Plaintiff's dosage of Prozac on May 1, 1997 to 20 mg twice a day, following her report that the initial dosage was ineffective. (Tr. 215).

20. Plaintiff returned to Dr. Naylor on May 2, 1997, stating that she had hurt her back two days earlier. (Tr. 213-14.) Dr. Naylor noted positive findings related to the SI joint, and diagnosed musculo-skeletal back pain[3] and prescribed Tylenol 3 for pain, heat and bed rest Id.

21. Plaintiff returned to Dr. Naylor on June 4, 1997, after yet another fall. (Tr. 211-212). Her physical exam showed a positive straight leg raising test on the right, negative on the left. He

---

[3]Dr. Naylor may have noted other positive findings, but they are not decipherable.

7

changed Plaintiff's anti-depressant medication from Prozac to Paxil (20 mg. per day) because the Prozac was causing a tremor. Id. Plaintiff returned to Dr. Naylor later that month complaining of sinus problems and allergies. No clinical findings were recorded relating to her back condition. Dr. Naylor increased Plaintiff's prescription of Paxil to 40 mg per day. No explanation for this change was recorded. (Tr. 209-210.) Plaintiff returned to Dr. Naylor on June 18, 1997, with continued complaints of pack pain. At that time her straight leg raising test had returned to normal, though he continued to list "m/s back pain" as part of his diagnostic impression. Laboratory testing was apparently positive for H. Pylori, and Plaintiff was treated for ulcers. ( Tr. 207-208.)

22. On July 17, 1997, Plaintiff reported back pain, poor appetite, and more depression. (Tr. 205). Dr. Naylor recorded positive findings regarding her L5 and S-I joints, but again did not specify what those findings were. His diagnoses included back pain, degenerative joint disease, depression, GERD and sacroiliac. He continued her on 40 mg of Paxil per day[4] and made changes in medications prescribed for her stomach problems. (Tr. 206).

23. Plaintiff was admitted to Miners' Hospital on July 29, 1997, for treatment of dehydration with orthostatic hypo-tension, gastroenteritis, nausea and vomiting, and rectal bleeding. (Tr.197-198). Musculo-skeletal and neurological examination on admission was " unremarkable." Id.

24. When last seen by Dr. Naylor the following month, Plaintiff was complaining of mild abdominal pain. Depression was not mentioned in the treatment note, nor were any findings related to Plaintiff's back. (Tr. 200-201).

25. Clint Morgan, M.D., assessed Plaintiff's residual functional capacity ("RFC") for the Disability

---

[4] Although Dr. Naylor's hand written note indicates an increase in Paxil, hospital records dated July 21, 1997, indicate that she was still taking 40 mg once a day. (Tr. 187).

Determination Services. Tr. 247-254. Dr. Morgan assessed a light work RFC. Dr. Morgan's report, dated August 19, 1997, was based on a review of medical records that did not include a treating or examining source statement regarding Plaintiff's physical capacities. (Tr. 247-255). Dr. Morgan's explanation for his findings included a reference to Dr. Naylor's April 18, 1997, office note which he interpreted as indicating a non-significant musculo-skeletal exam. Dr. Naylor's note did, however, record positive, though unspecified, findings related to the sacro-iliac. (Compare Tr. 248 with Tr. 205-206). This discrepancy was not explained. Dr. Morgan also misread Plaintiff's recorded height, listing it as 5'8". Records documenting Plaintiff's height list it as 5' 3" (Compare Tr. 248 with Tr. 236, 217). Dr. Morgan's evaluation was limited to Plaintiff's orthopedic condition, and did not discuss Plaintiff's other diagnosed medical conditions.

**B.     Medical evidence presented to the Appeals Council.**

26.    Plaintiff began receiving mental health counseling and treatment through Taos/Colfax Community Service on April 13, 1999. The social worker overseeing her care noted that Dr. Naylor had previously diagnosed and treated Plaintiff for depression, but that Plaintiff had been unable to continue use of antidepressant medication two-three months earlier when she lost Medicaid benefits. (Tr. 295, 306). Plaintiff stated that her problems had intensified once she discontinued medication. (Tr. 306). As of April 13, Plaintiff's mental status was rated as normal, except for mild sadness and worry, a mildly decreased amount of motor activity, mild sensitivity and dependance, mild depression, and mild thoughts of suicide, hopelessness and worthlessness. (Tr. 299). Based on the intake evaluation and mental status examination, Plaintiff was diagnosed as suffering from depression, with a current GAF of 50. (Tr. 298). No estimation was made of past GAF.

27.    Jafet Gonzalez, M.D., conducted a psychiatric evaluation on May 5, 1999. Plaintiff advised

9

Dr. Gonzalez that she became depressed in 1993, but that her depression had worsened in the past six months, despite taking antidepressant medication as prescribed. (Tr. 307). She attributed the worsening depression to events that occurred in late 1998 or early 1999. (Tr. 307). In assessing her mental status, Dr. Gonzalez found Plaintiff to be depressed with some degree of hopelessness. She was unable to calculate serial 7s, had fair attention span and concentration and a lower than expected fund of general knowledge. Her insight and judgment were assessed as "fair for treatment." (Tr. 308). Dr. Gonzalez diagnosed Major depression, severe, without psychotic symptoms, recurrent, as assessed her current GAF of 49. No estimation was made of past GAF. He recommended psychotherapy and treatment with Paxil. The administrative record documents psychotherapy treatment through August 1999. (Tr. 311-325).

### III.     The ALJ's Decision

28.     The ALJ found that Plaintiff had severe impairments of obesity and degenerative disc disease of the lumbar spine with associated back pain. He rejected her claims of impairment based on depression, gynecological and gastrointestinal problems. He found that she did not meet the then applicable listing for *per se* disability for obesity, citing to Listing §9.09, *Table II-Women*, utilizing the height and weight criteria for a woman 5'8" tall, five inches taller than Plaintiff. (Tr. 16; 20 C.F.R. Pt 404, Subpt. P, App. 1, §9.09 (1998)). The ALJ found that Plaintiff retained the RFC for light work, relying on the evaluation of non-examining physician, Clint Morgan, M.D. He determined that Plaintiff's testimony was not credible, citing to her unsuccessful work attempt in 1996, his finding that she did not have a Listed impairment, his finding that she had the RFC for light work, the absence of statements from treating or examining physicians that she was unable to work, and her testimony regarding daily activities and social interaction. (Tr. 13, 18)**.**

**IV.     Analysis**

    **A.     Mental Impairment**

29.     A claimant is responsible for furnishing medical evidence of claimed impairments. 20 C.F.R. §§ 404.1512(a),(c), 416.912(a), (c) but the Commissioner also has the duty to ensure that an adequate record is developed relevant to the issues raised. **see Hawkins v. Chater**, 113 F.3d 1162, 1164 (10th Cir. 1997). The ALJ is required to "evaluate every medical opinion" he receives, 20 C.F.R. §§404.1527(d), 416.927(d), and to "consider all relevant medical evidence or records in reaching a conclusion as to disability." **Baker v. Bowen**, 886 F.2d 289, 291 (10th Cir. 1989). Although he is not required to discuss every piece of evidence, the ALJ "must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." **Clifton v. Chater**, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (citations omitted).

31.     Plaintiff stated, and the medical record bears out, that she had been taking anti-depressant medication since April 7, 1997. (Tr. 70, 94, 215, 243). At the hearing before the ALJ, she testified that she took Prozac for her nerves. (Tr. 337). The history of treatment with anti-depressant medication and testimony regarding depression places the issue of mental impairment before the ALJ. **Hawkins v. Chater**, 113 F.3d at 1164 fn. 2.

32.     There is no issue of mental impairment prior to the date Plaintiff was last insured for DIB benefits, September 30, 1996. Prior to that time, there was only one reference to depression, unsupported by any clinical data or recommendation for treatment. The question before the Court is therefor limited to whether the ALJ applied proper legal principles in determining that Plaintiff had no medically determinable mental impairment in the time frame relevant to Plaintiff's claim for SSI benefits.

32.     Dr. Naylor diagnosed depression and prescribed anti-depressant medication.  This is evidence of the existence of a mental impairment.   Section 421(h) of Title 42 provides that

> [a]n initial determination ... that an individual is not under a disability, in any case where there is evidence which indicates the existence of a mental impairment, shall be made only if the Secretary has made every reasonable effort to ensure that a qualified psychiatrist or psychologist has completed the medical portion of the case review and any applicable residual functional capacity assessment.

This provision applies to claims for SSI benefits and for disability insurance benefits.  **Andrade v. Sec. of Health & Human** Services, 985 F.2d 1045, 1048 (10th Cir. 1993).

33.     The ALJ did not comply with the mandate of 42 U.S.C. §421(h), and instead, made the initial determination himself as to whether Plaintiff was under a mental disability.  This failure to apply proper legal principles requires reversal for additional proceedings with regard to Plaintiff's claim for SSI benefits for the closed period of April 18, 1997 through January 21, 2000.

### B.    Evaluation of Obesity

34.     Plaintiff challenged the ALJ's finding that her obesity did not rise to Listing level severity.  Review of this claim in complicated by three factors: the ALJ's error in evaluating evidence, the language used by the ALJ,  and a change in the regulations regarding obesity.

35.     Under the criteria in effect at the time of the ALJ's decision,  a woman 5'3" tall had to weigh 250 lbs., and exhibit certain additional findings to be to be considered disabled due to obesity.  The required weight for a woman 5'8" tall was 290 lbs.  Plaintiff's height and weight were recorded numerous times in the medical record.  Plaintiff is 5'3" tall.  Her weight has varied, with maximum weight per year recorded as:   1993 -  209½ lb. (Tr. 116);1994 -  no recorded weights; 1995-   223 lb. (Tr. 236);  1996 -  no recorded weights, 1997 - 248 lb. (Tr. 209).

36.     The ALJ analyzed Plaintiff's claim of obesity, assuming that she was 5'8" tall.  Based upon this error, the ALJ found that Plaintiff did not "approach" the weight requirements for a listed impairment based on obesity. (Tr. 16).   The ALJ did not indicate what he meant by the term "approach," and Plaintiff's weight of 248 lbs. in 1997 certainly "approaches" that required for listing level severity.  The Court cannot know whether the ALJ would have decided this issue differently, at least for the year 1997, had he utilized the correct height and weight criteria.[5]

37.     These criteria, however, are no longer in effect.  Listing 9.09 relating to obesity was deleted from the Listing of Impairments effective October 25, 1999. **See** Revised Medical Criteria for Determination of Disability, Endocrine System and Related Criteria, 65 Fed.Reg. 46, 122 (1999). New language relating to obesity was inserted in listing sections 1.00(F) (musculo skeletal system), 3.00(I) (respiratory system), and 4.00(F) (cardiovascular system) which provides that obesity must be evaluated for its effects on the claimant.  The removal of former Listing 9.09 and subsequent revision to the other listing sections is the law in effect for this case. **See Landgraf v. USI Film Products,** 511 U.S. 244, 273-77 (1994) (reaffirming general principle that a court is to apply the law in effect at the time of its decision); and SSR 00- 3p "Titles II and XVI: Evaluation of Obesity," 65 Fed.Reg. 31, 039 (2000) ( "The final rules deleting listing 9.09 apply to claims that were filed before October 25, 1999, and that were awaiting an initial determination or that were pending appeal at any level of the administrative review process or that had been appealed to court.").

---

[5]The ALJ also found that the medical records did not establish the additional requirements of Listing §9.09(A).  In doing so, he characterized June and August 1993 evaluations as indicating significant work capacities. (Tr. 17)  It is not clear what the ALJ meant by "significant work capacities," and  the records themselves are not substantial evidence of an ability to work more than four hours per day, with significant exceptional limitations. (See ¶¶8-9, above).  He also ignored Dr. Naylor's records on the ground those records were not legible.  The records are not so illegible as to warrant their complete disregard, and do contain evidence relevant to the analysis of Obesity as a Listed impairment.

38.	This Court can not weigh the evidence in order to make the determination as to whether Plaintiff established an impairment of Listing level severity. Accordingly, on remand, the Commissioner should reconsider whether Plaintiff established a Listed Impairment, utilizing the newly established criteria.

39.	Because this matter must be remanded for additional proceedings applicable to steps two and three of the sequential evaluation process, I do not find it necessary at this point to address Plaintiff's further claims of error. However, on remand, the Commissioner may not ignore the medical records of Dr. Naylor on the grounds that those records are not legible. The Commissioner is also instructed to make credibility findings in accordance with **Luna v. Bowen**, 834 F.2d 161 (10th Cir. 1987) and **Kepler v. Chater**, 68 F.3d 387 (10th Cir. 1995)  Further, the Commissioner is  instructed that in making his findings, he is to address the evidence as it pertains to Plaintiff's physical and mental condition as of September 30, 1996 (the date last insured for DIB benefits) and  as of April 18, 1997, through April 20, 1998 (the dates relevant for Plaintiff's claim for SSI benefits).  This decision does not dictate a given outcome on remand.  Rather, it assures that correct legal standards will be used in arriving at a decision based on the facts.  **Huston v. Bowen**, 838 F.2d 1125, 1132 (10th Cir. 1988).

## IV.     Recommendation

40.     For these reasons, I recommend that Plaintiff's Motion to Reverse and Remand be granted in part, and that his case be remanded to the Commissioner with instructions to conduct additional proceedings in accordance with this Analysis and Recommended Disposition.

_____
**RICHARD L. PUGLISI**
**UNITED STATES MAGISTRATE JUDGE**